IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|                                   |   |                         |
|-----------------------------------|---|-------------------------|
| BRANHAVEN, LLC,                   | * |                         |
|                                   | * |                         |
| Plaintiff/Counter-Defendant,      | * |                         |
|                                   | * |                         |
| v.                                | * | CIVIL NO.: WDQ-11-2334  |
|                                   | * |                         |
| BEEFTEK, INC., *et al.*,          | * |                         |
|                                   | * |                         |
| Defendants/Counter-Plaintiffs,    | * |                         |
|                                   | * |                         |
| v.                                | * |                         |
|                                   | * |                         |
| SCIDERA, INC.,                    | * |                         |
|                                   | * |                         |
| Counter-Defendant.                | * |                         |

*   *   *   *   *   *   *   *   *   *   *   *   *
MEMORANDUM OPINION

Branhaven, LLC ("Branhaven") sued BeefTek, Inc.
("BeefTek"), BT Selection, LLC ("BTS"), and PrimeBeefMarker, LLC
("PML") (collectively the "defendants")[1] for declaratory judgment
and an injunction. The defendants counterclaimed, joining
Scidera, Inc. ("Scidera") as a counterdefendant, for declaratory
judgment and specific performance. Pending are Branhaven's and
the defendants' cross-motions for summary judgment. Also
pending is the defendants' motion for leave to file a surreply.

---

[1] BeefTek, BTS, and PML are all related entities. *See infra* at
12 (discussing current structure). When the identity of a
particular entity is important, the Court will refer to that
entity by name. When the identity is unimportant to the
discussion or unclear, "BeefTek" or "the defendants" will be
used.

For the following reasons, the summary judgment and surreply motions will be denied.

I. Background[2]

MetaMorphix, Inc. ("MMI") and MetaMorphix Genomics, Inc.[3] ("MMIG") were genetics research companies. *See* ECF No. 74-3 at 3. MMI[4] developed genetics testing (the "Technology") for predicting various traits in cattle. *See* ECF No. 70-5 at 3, Tr. 11:23-12:4.

In 2009, the CEO of MMI, Dr. Edwin Quattlebaum, discussed with John Lamar the possibility of a business partnership to commercialize the Technology. *See* ECF No. 70-3 at 3-4, Tr. 33:1-34:17. To this end, Lamar and Tom Hogan formed BTS and PML. *See id.* at 4, Tr. 34:21-35:21. Michael Cohen worked with Lamar and Hogan at BTS and PML. *See generally* ECF No. 70-8. Lamar and Hogan intended BTS engage in "integrated beef

---

[2] On cross-motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

[3] The relationship between MMI and MMIG is unclear. The Court will generally use "MMI" to refer to both companies.

[4] MMI collaborated with Cargill, an agriculture company, to create the Technology. *See* ECF No. 70-5 Tr. at 11:23-12:4. Cargill is not a party to this case or the agreements at issue.

2

development services,"[5] and PML to market MMI's genetic tests to the cattle industry. ECF No. 70-3 at 4, at Tr. 37:2-11.

On August 25, 2009, Quattlebaum and Lamar exchanged several emails concerning a draft agreement between MMI and BTS for use of the Technology. ECF No. 66-19. The draft agreement gave BTS exclusive rights to the Technology so long as it met minimum test volumes starting in the second year of the contract. *Id.* at 4. Quattlebaum was concerned that if BTS failed to secure funding, MMI would be locked out of the marketplace for two years. *Id.* at 3. Lamar responded that they would "go[] forward" only if BTS was financed, which required a signed agreement. *See id.* at 2. He also stated that "if for any reason after the first year we do not go forward we will cancel and the exclusivity issue is moot. If we do go forward, we have minimum testing purchase requirements that assure MMI of ongoing volume. If we don't meet those requirements or pay for them then the agreement is over. I don't see where MMI is 'locked

---

[5] The Licensing Agreement defines an "Integrated Beef Development System" as "a comprehensive individual animal analysis and selection process using Marker Assisted Selection . . . of cattle at varying stages of production for a specific market." ECF No. 70-4 at 3.

"BeefTek is in the business of . . . identifying, selecting, owning, managing cattle and employing a number of selection processes including DNA selection and management protocols to achieve an above average yield in return on the sale of the animals." ECF No. 70-3 at 5, Tr. 41:7-12.

3

out.'" *Id.* The draft agreement did not contain any cancellation provisions. *See id.* at 4-6.

On September 22, 2009, MMI and BTS signed a document (the "Licensing Agreement") captioned:

LICENSING AGREEMENT
METAMORPHIX AND BEEFTEK

Letter of Agreement

ECF No. 70-4; *see* ECF No. 66-19.[6] The Licensing Agreement is a more detailed version of the draft agreement from the August 25, 2009 emails. *Compare* ECF No. 70-4 *with* ECF No. 66-19 at 4-6.

Under the Licensing Agreement, MMI agreed to (1) make the Technology available to BTS, (2) provide testing services "at rates to be agreed upon and which will be in accordance with the prices set forth on Schedule A," and (3) to provide testing results within 10 days of receipt during the first six months of the agreement and within 30 days thereafter. ECF No. 70-4 at 2. BTS was granted exclusive use of the Technology for an Integrated Beef Development System, so long as BTS ordered a

---

[6] The copy of the Licensing Agreement supplied by Branhaven is missing its fourth page. *Compare* ECF No. 66-3 *with* ECF No. 70-4. It appears that this is a clerical error and not an indication that the page was not a part of the Licensing Agreement; Branhaven relies on the choice of law provision on that page. *See* ECF No. 66-1 at 24; *see also* ECF No. 15-1 (exhibit to the amended complaint containing the missing page).

minimum number of tests.[7]  *Id.*  MMI could revoke the exclusivity provision if BTS "fail[ed] to pay any undisputed amounts for Testing services in a timely manner after having been provided with a reasonable notice and cure period."  *Id.*

The Letter of Agreement also provided that "MMI and BT[S] will agree upon a satisfactory method to provide security to BT[S] for future Testing utilizing the Technology."  *Id.* at 3. To this end, MMI represented that it had "identified and validated a testing services arrangement with a capable third party testing company ('TSC')" and would provide BTS "with an independent technical third party ('TTP') who will provide evidence reasonably satisfactory to BT[S] of the availability, capability and qualifications of such TSC to conduct the testing."  *Id.* at 4.  Additionally, "[s]uch security will include the placement of all necessary Technology . . . in a secure escrow account."  *Id.*  BTS and its TSC would gain access to the escrowed Technology "in the event of default by MMI in the performance of this Agreement, or MMI's failure to meet the standards and requirements necessary to remain the exclusive

---

[7] The minimum number of tests were:

| Year 2 | 150,000 tests |
|---|---|
| Year 3 | 250,000 tests |
| Year 4 | 400,000 tests |
| Year 5 and beyond | 500,000 tests |

ECF No. 70-4 at 3.

Testing provider." *Id.* Further, when "BT[s] has the right to utilize a TSC to conduct testing, it will have access to the escrowed [T]echnology . . . . In such an event, BT[S] will be responsible for paying for test services directly to the TSC and for paying MMI the Predictability Incentive set forth in Schedule A." *Id.*

The Agreement was effective the earlier of October 2, 2012, or the date when Cargill agreed to implementation. *Id.* at 5. The Licensing Agreement stated that it was governed by Delaware Law. *Id.* The Licensing Agreement included a lengthy paragraph stating the parties' indemnification duties, and concluded that "[t]he formal contract that will further detail the agreement between the parties set forth herein will include customary terms and conditions concerning indemnification among the parties." *Id.* The last line of the Licensing Agreement stated that "MMI and BT[S] agree to execute a formal contract further detailing the agreement between the parties set forth herein." *Id.*

Attached to the Licensing Agreement was "Schedule A." *Id.* at 7. Schedule A listed the initial price for each DNA sample as $5.75 for a one-panel test, $7.16 for two panels, and $1.41 for each additional panel. *Id.* If MMI's costs changed by more than 10% in a quarter, it was permitted to revise the price, although the maximum was not permitted to exceed $7.00 for a

one-panel test, and $1.41 for additional panels. *Id.* MMI was also entitled to a "predictability incentive" based on the number of cattle designated "Choice" or "Prime" under the USDA's grading system. *See id.* at 8 (incentive table). "Incentive compensation for additional traits will be mutually agreed upon when and if tests for such traits are developed by MMI and adopted by BT[S]." *Id.*

Schedule A also stated that

BT[S] shall have the option of arranging for alternative TSC(s) of its choice to conduct such testing and MMI shall be provided a two week option of meeting the alternative terms and conditions. In such an event BT[S] will be responsible for paying for test services directly to the TSC and for paying MMI the Predictability Incentive set forth in this Schedule A.[8]

*Id.* at 7. It also stated that the Predictability Incentive "shall not be due to MMI at any time that MMI is in breach of the [Licensing] Agreement or is not meeting the standards and requirements necessary to remain the exclusive testing provider hereunder." *Id.* at 8.

Effective October 15, 2009,[9] MMI and PML executed a "Distribution Agreement" in which MMI appointed "PML as MMI's independent representative to market and sell MMI Tests to the

---

[8] Lamar drafted this provision. *See* ECF No. 70-3 at 9, Tr. 70:15-16.

[9] The date the Distribution Agreement was executed is unclear. An October 23, 2009, email from Quattlebaum to Lamar indicates that the agreement had not yet been signed. ECF No. 66-4.

beef cattle industry." ECF No. 70-9 at 2. MMI agreed to make the testing available to PML for use in the beef cattle industry, including modifications, enhancements, or improvements and provide testing results within 10 days of receipt. *Id.* at 3.

The parties agreed to set a price for the testing of not more than $8.00 for a one-panel test, $10.00 for two panels, and $2.00 for each additional panel in a single DNA sample. *Id.* MMI was also "entitled to share in the profit . . . as outlined in Schedule A."[10] *Id.* PML was granted nine months of exclusivity, plus an additional six months if it met certain testing volume. *See id.* at 3-4. The parties agreed "to negotiate the terms for permanent exclusive rights to distribute Tests" provided additional quotas were met. *Id.* at 4.

The Distribution Agreement also stated that "MMI will provide security to PML for future Testing." *Id.* MMI

---

[10] This Schedule A which is not the same as the Letter of Agreement's, contained only the profit sharing arrangement:
    50% of the excess revenue PML receives above the following prices for the first 250,000 tests conducted in any quarter:
    1 panel test: $13.00
    2 panel test: $16.00
    3 panel test: $19.00
    Plus 50% of the excess revenue PML receives above the following prices for all tests exceeding 250,000 conducted in any quarter:
    1 panel test: $12.00
    2 panel test: $15.00
    3 panel test: $18.00
ECF No. 70-9 at 8.

identified a TSC and agreed to provide a TTP to evaluate the TSC. *Id.* MMI also agreed to place the Technology in an escrow account. *Id.* at 3. PML and its TSCs were to gain access to the Technology if MMI defaulted or it failed "to meet the standards and requirements necessary to remain the exclusive Testing provider." *Id.* If MMI were unable to provide testing results within the required time, "PML shall have the right to use a TSC . . . provided that, PML has provided MMI written notification."[11] *Id.* at 5. The Distribution Agreement stated that it was governed by Delaware law. *Id.* at 6.

Around the time the Agreements were executed, MMI selected BioStat as the TTP and provided it with the Technology. ECF Nos. 70-3 at 13, Tr. 106:1-2; 70-5 at 7, Tr. 28:2-6. MMI identified KBioscience as a potential TSC; however, about two days before the Licensing Agreement was executed, BioStat indicated that it could not recommend KBioscience. *See* ECF Nos. 70-3 at 14, Tr. 110:2-5, 110:22-111:4; 70-5 at 7, Tr. at 27:15-20, BioStat recommended other potential TSCs, but they were "extraordinarily expensive, cumbersome and more human genome related." ECF No. 70-3 at 14, Tr. 111:10-14.

---

[11] MMI received a two-week cure period for the first two late performances. ECF No. 70-9 at 5.

BeefTek sent 1564 samples to MMI for the first testing.[12] ECF No. 70-6 at 4, Tr. at 38:2-12. Of those, 800 samples were misplaced, and BeefTek did not receive results for 40 days. *Id.* at Tr. 39:20-21, 40:6-8. For the next round of samples, MMI lacked the funds to purchase the reagent to extract the DNA from the card; BeefTek ultimately purchased the reagent. *Id.* at Tr. 41:6-20.

On November 4, 2009, Cohen emailed a potential investor indicating that the Licensing Agreement was in place, noting "[f]or all its flaws, it is serving us well--[MMI] has ramped up its efforts in support of our agenda wonderfully." ECF No. 66-20. Cohen also indicated that "DLA Piper is drafting both (a) a more-detailed contract, and (b) a [T]echnology escrow agreement." *Id.*

On January 28, 2010, holders of MMI's 10% promissory notes filed a petition for involuntary Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the District of Delaware. *In re MetaMorphix, Inc.*, No. 10-10273 (Bankr. D. Del.). Effective March 9, 2010, MMI executed with BTS the "First Amendment to the Licensing Agreement" and with PML the "First Amendment to the Distribution Agreement." ECF Nos. 70-10, 70-11. The Amendment to the licensing agreement added a "trigger date" for calculating the term of the agreement and the 60 days within

---

[12] The date these samples were sent is unclear.

10

which MMI had to provide testing results within ten days. ECF
No. 70-10 at 2. The trigger date was the earlier of "(i) the
date on which the two-hundredth test has been performed under
this Agreement, or (ii) July 1, 2010." *Id.* at 5. The escrow
release provision was revised to permit release:

> in the event of default by MMI in the performance of this
> Agreement, or MMI's failure to meet the standards and
> requirements necessary to remain the exclusive Testing
> provider hereunder, or repeated material failures to
> perform under the Agreement, including failing to meet the
> timelines for delivery of Testing results as provided for
> in this Agreement or for use of a TSC permitted under this
> Agreement or as otherwise provided herein. [13]

*Id.* at 2-3. The Amendment stated that the licenses in the
agreement were intellectual property licenses under 11 U.S.C. §
365(n); if MMI rejected the agreement under that section, BTS
was permitted to retain its rights. *Id.* at 4. The amendment
also stated that "The Agreement shall remain unchanged and in
full force and effect." The Amendment to the Distribution
Agreement was substantially the same, with the exclusivity
provisions measuring from the trigger date.[14] *See* ECF No. 70-11
at 2.

---

[13] MMI retained its two-week cure period, "unless two or more
instances of subsequent late performance occur on trait testing
for marbling within any 90 day period." ECF No. 70-10 at 3.

[14] The escrow release provision to the Distribution Agreement
omitted the words "or repeated material failures to perform
under the Agreement" but was otherwise the same, including the
language about failing to meet the timelines for delivery.
*Compare* ECF No. 70-10 at 2-3, *with* ECF No. 70-11 at 3.

On March 10, 2010, BTS and PML each entered into Three-Party Escrow Service Agreements with MMI and Iron Mountain Intellectual Property Management, Inc. ("Iron Mountain"), through which MMI deposited the Technology for the benefit of BTS and PML respectively. ECF Nos. 70-12, 70-13. Release was permitted upon:

> (i) Depositor's breach of the License Agreement or other agreement [subject to the two-week cure period and the Beneficiary being current on undisputed payments]; or
>
> (ii) Failure of the Depositor to function as a going concern or operate in the ordinary course . . .; or
>
> (iii) Depositor's failure to meet the standard and requirements necessary to remain the exclusive Testing . . . provider [subject to the two-week cure period and the Beneficiary being current on undisputed payments]; or
>
> (iv) Depositor is unable to provide Test . . . results within the required reporting period [subject to the two week-cure period and the Beneficiary being current on undisputed payments]; or
>
> (v) To allow Beneficiary to use any TSC consistent with the License Agreement.

ECF No. 70-12 at 14.[15]

In July 2010, BTS and PML closed on their investors' funding, and BeefTek was incorporated in Delaware.[16] See ECF No.

_____

[15] The release provisions for the escrow agreement for the Distribution Agreement were identical, including the references to "License Agreement." *See* ECF No. 70-13 at 15.

[16] Hogan and Lamar initially intended BTS to be known as "BeefTek" but there was another Texas company with a similar name. ECF No. 70-3 at 4, Tr. 35:9-14. Texas is BeefTek's principal place of business. ECF Nos. 15 ¶ 2; 31 ¶ 2.

66-2 at 3, Tr. 40:7-10. BTS was merged into BeefTek, and PML became its subsidiary. *Id.* at 13-18.

In the Fall of 2010, the holders of MMI's 12.5% promissory notes contacted Christopher Paxos--who had previously worked with the holders of MMI's 10% promissory notes--to advocate for them in the bankruptcy proceeding. *See* ECF No. 70-7 at 7, Tr. at 31:4-33:9. Around that time, Branhaven was formed as a Maryland LLC with Elena Fanno--a citizen of Ohio and friend of Paxos with no bovine genomics experience--as the sole member. *Id.* at 8, Tr. at 34:4-15; ECF Nos. 15 ¶ 1, 31 ¶ 1, 91-1 ¶ 4. The 12.5% noteholders invested $3,000,000 in Branhaven notes that were then converted into Scidera stock.[17] ECF No. 70-7 at 8-9, Tr. 37:6-38:19.

On September 30, 2010, MMI's bankruptcy was converted to Chapter 11. *See In re MetaMorphix, Inc.*, No. 10-10273, ECF No. 63 (Bankr. D. Del.). On November 18, 2010, MMIG filed a voluntary Chapter 11 petition. *See In re MMI Genomics, Inc.*, No. 10-13775, ECF No. 1 (Bankr. D. Del.). On November 30, 2010, the bankruptcy cases were combined. *Id.*, ECF No. 4. That day, MMI and MMIG moved for approval to assume the amended Agreements

---

[17] Although the record does not indicate when Scidera was created, the Delaware Department of State's records indicate that it was incorporated there on April 13, 2011. *See* https://delecorp.delaware.gov/tin/controller (search "Scidera, Inc."). Scidera's principal place of business is in California. ECF Nos. 31 ¶ 6, 34 ¶ 6.

under 11 U.S.C. § 365. ECF No. 15-8; *In re MetaMorphix, Inc.*, No. 10-10273, ECF No. 155 (Bankr. D. Del.).

Meanwhile, problems with testing continued. On November 9, 2010, Hogan emailed Quattlebaum complaining that at least two tests for "1,000 head . . . from Schwertner" and "90+ head of Red Angus heifers"[18] were "WAY past due." ECF No. 70-14. On November 29, 2010, Lamar complained to Quattlebaum about the late testing, and indicated that an alternate testing facility would need to be "[i]n view of the current situation at MMI" and "in the event that MMI is unable to process tests on a timely basis." ECF No. 70-15.

In late 2010,[19] Lamar spoke to Quattlebaum about the release of the Technology from escrow for protection of the BeefTek investors. *See* ECF Nos. 15 ¶ 30; 31 ¶ 30; 70-3 at 15, Tr. 120:7-10, 121:6-9; 70-5 at 14, Tr. 69:11-16. Although the defendants had been operating for approximately a year without an approved TSC, they desired the Technology so that they could evaluate whether other laboratories were capable of providing the testing, particularly in light of MMI's financial difficulties. ECF No. 70-3 at 15, Tr. 119:3-18. The decision

---

[18] The Red Angus tests were delivered to MMI on either September 15, 2010 or September 17, 2010, and the tests from Schwertner on October 1, 2010. *See* ECF Nos. 70-14, 70-16.

[19] The exact dates of these conversations are not clear. *See* ECF NO. 70-3 at 15, Tr. 121:6-9.

to seek withdrawal of the escrow was made "jointly collectively
within BeefTek and PML, Mr. Hogan, Mr. Cohen and John Lamar and
others who we discussed, all decided we have to have them." ECF
No. 70-3 at 15 Tr. 118:15-17.

Quattlebaum spoke to MMI's bankruptcy attorney and
presented the request to MMI's board, which did not object to
the request. ECF No. 70-5 at 13, Tr. 59:14-60:2. On December
10, 2010, Quattlebaum, for MMI, and Lamar, for BeefTek as PML's
parent, signed a Work Request for release of the Technology.
ECF No. 66-12. Iron Mountain released the Technology.[20]

On February 25, 2011, BeefTek and PML objected to MMI's
assumption of the amended Licensing Agreement and Distribution
Agreements in the bankruptcy case. *In re MetaMorphix, Inc.*, No.
10-10273 (Bankr. D. Del.), ECF No. 300. On March 9, 2011,
Branhaven agreed to purchase substantially all of MMI and MMIG's
assets and assume the majority of their contracts.[21] ECF No. 15-
10 at 24. On March 17, 2011, the bankruptcy court approved the
sale. ECF No. 15-10 at 21. On April 20, 2011, BeefTek, PML,
MMI, MMIG, and Branhaven all stipulated to the withdrawal of the

---

[20] Although there is no evidence in the record that directly
describes the release, there is no dispute that this occurred.
*See* ECF Nos. 66-1 at 21, 70-1 at 21; *see also* ECF No. 66-15 at 3
(Cohen's testimony implying that the defendants' acquired and
retained the escrowed Technology).

[21] Branhaven rejected a few agreements, such as a licensing
agreement with Johns Hopkins. *See* ECF No. 70-7 at 14, Tr. 92:2-
21.

15

objection and that Branhaven would assume the agreements. ECF No. 70-18. Branhaven gave BeefTek and PML adequate assurance of future performance of the agreement. ECF No. 70-18 ¶ 8; *see* ECF No. 70-7 at 25, Tr. 182:13-183:3. The Stipulation also stated that "[e]xcept as modified by this Stipulation, all terms of the Agreement shall remain in full force and effect. This Stipulation is not a novation." ECF No. 70-18 ¶ 9.

Six weeks after its purchase of MMI's assets, Branhaven transferred the majority of its assets to Scidera. ECF No. 70-7 at 9, Tr. at 38:20-39:8. However, the Technology and the Agreements with BTS and PML were not assigned to Scidera. *Id.* at 26, Tr. 110:12-17. Branhaven currently has no employees or operations. *Id.* at 9, Tr. at 39:9-14.

After Branhaven assumed the Agreements, BeefTek and PML forwarded samples[22] for testing on "several" occasions. ECF No. 70-6 at 5, Tr. 58:11-15. Although BeefTek and PML ultimately received results, they were not delivered within the times specified in the Agreements. *See id.*, Tr. 59:9; ECF No. 70-8 at 8, Tr. 89:5-17. On April 7, May 12, and June 4, 2011, Cohen and Hogan emailed Branhaven and Scidera personnel about the continuing delays. ECF Nos. 70-20, 70-21, 70-22. Cohen and

---

[22] These samples had not previously been sent to MMI. ECF No. 70-6 at 5, Tr. at 58:16-59:3.

16

Lamar then met with Paxos in New York City.[23] ECF No. 70-3 at
16, Tr. at 135:3-5. Paxos indicated that Branhaven[24] wanted to
modify the terms of the agreements and the Technology to be
returned to escrow. *Id.*, Tr. 136:1-9. Lamar and Cohen
expressed their openness to negotiation, and Lamar believed the
meeting was "very cooperative" and "very constructive." *Id.*,
Tr. 10-17.

Not long thereafter, Paxos and Mark Ravich--one of the
Branhaven investors--called Lamar and Cohen. *See* ECF No. 70-7
at 19, Tr. at 110:21-25. Ravich refused to discuss the
Agreements or Branhaven's relationship until the Technology had
been put back into escrow, and threatened to sue BeefTek and
PML. ECF No. 70-3 at 17, Tr. 139:4-9; *see* ECF No. 70-8 at 9,
Tr. at 92:2-93:15. BeefTek and PML had no further substantive
communication with Branhaven or Scidera. *See* ECF No. 70-3 at
17, Tr. at 139:13-15. BeefTek and PML ultimately received all
results from Branhaven and paid all outstanding invoices. *See*
ECF No. 70-8 at 8, Tr. 89:10-20. However, BeefTek and PML
failed to send sufficient tests to Branhaven to meet the minimum
testing requirements and did not provide the data necessary to
calculate the Predictability Incentive. ECF No. 66-17.

---

[23] The date of this meeting is not clear.

[24] Lamar was not sure whether Paxos was representing Branhaven,
Scidera or both. *See* ECF No. 70-3 at 16, Tr. at 135:21-22. For
simplicity, the Court will simply refer to Branhaven.

On July 29, 2011, BeefTek requested the release of the Technology from escrow to allow its use of a TSC. ECF No. 70-23. On August 10, 2011, Branhaven sent Lamar a letter asserting that BeefTek and PML were not entitled to the Technology because there had been no breach, and again demanded that BeefTek and PML return the previously escrowed Technology that they still possessed. ECF No. 15-13.

On August 22, 2011, Branhaven filed suit. ECF No. 1. On September 20, 2011, Lamar advised Paxos that BeefTek was "exercising [its] right under the Licensing Agreement to arrange for alternative TSC to conduct [its] testing." ECF No. 70-24. It appears Branhaven did not respond. BeefTek has since used an alternate TSC.[25] *See* ECF No. 66-15 at 3, Tr. at 83:15-16.

On October 20, 2011, Branhaven filed an amended complaint, seeking a declaration that (1) the defendants have no right to retain possession of the Technology, (2) the defendants' right of access to the Technology is conditioned on Branhaven's breach, and (3) it is not in breach of the agreement, and an injunction restraining the defendants from using the Technology and requiring them to return it.[26] ECF No. 15.

---

[25] The identity of the TSC is not in the record.

[26] In the original and amended complaints, Branhaven also asserted an unfair competition and false designation of origin claim under the Lanham Act, but the parties dismissed this count with prejudice. *See* ECF Nos. 1, 15, 62.

18

On November 10, 2011, the defendants answered and counterclaimed against Branhaven and Scidera, for (1) a declaration that BeefTek has satisfied its obligations under the Licensing Agreement entitling it to performance by Branhaven and Scidera, (2) specific performance under the Licensing Agreement, (3) a declaration that PML has satisfied its obligations under the distribution agreement and Branhaven and Scidera are in breach, (4) specific performance of the Distribution Agreement, and (5) a declaration that PML properly gained release of the Technology in escrow and may use it. ECF No. 31. On November 30, 2011, Branhaven and Scidera answered the counterclaim. ECF No. 34.

On September 7, 2012, Branhaven moved for summary judgment. ECF No. 66. On October 4, 2012, the defendants cross-moved for summary judgment and responded. ECF No. 70. On October 19, 2012, Branhaven responded and replied. ECF No. 74. On November 6, 2012, the defendants replied. ECF No. 77.

On January 2, 2013, Neogen Corporation issued a press release announcing that it had acquired the assets of Scidera Genomics, LLC.[27] ECF No. 82-3. On January 16, 2013, the defendants moved for leave to file a surreply addressing this sale. ECF No. 82. On February 4, 2013, Branhaven opposed the

---

[27] Although unclear, it appears that Scidera Genomics was the operating entity for the parent company Scidera, Inc. *See* ECF No. 70-19 at 21:21.

motion, and, if the motion were to be granted, requested leave to file a sur-sureply. ECF No. 85.

II. Analysis

A. Subject-Matter Jurisdiction

Federal courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1193 (2010). In its summary judgment brief, Branhaven claims diversity jurisdiction under 28 U.S.C. § 1332. ECF No. 66-1 at 10.

"Section 1332 requires complete diversity among parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). As a corporation, BeefTek is a citizen of Delaware, the state of incorporation, and Texas, its principal place of business. *See* 28 U.S.C. § 1332(c)(1); ECF Nos. 15 ¶ 2; 31 ¶ 2.

LLCs bear the citizenships of all their members. *See Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004); *Clephas v. Fagelson, Shonberger, Payne & Arthur*, 719 F.2d 92, 93-94 (4th Cir. 1983). PML is wholly owned by BeefTek and bears its citizenship. *See* ECF No. 86. Similarly, BTS has been merged into BeefTek. *Id.* Branhaven is a citizen of Ohio

as it bears the citizenship of Fanno, its sole member.[28]  *See* ECF No. 91-1 ¶¶ 3-4.  Because there is complete diversity between Branhaven and the defendants, the Court has diversity jurisdiction over Branhaven's claims and the defendants' counterclaims against Branhaven.  *See Cent. W. Va. Energy*, 636 F.3d 103.

Diversity jurisdiction alone, however, cannot sustain the defendants' counterclaim[29] against Scidera.  Scidera is a citizen of Delaware--its state of incorporation--and California, its principal place of business.  *See* 28 U.S.C. § 1332(c)(1); ECF Nos. 31 ¶ 6, 34 ¶ 6.  Because the defendants and Scidera are

---

[28] The parties' citizenship on the date of the filing of the complaint is controlling for diversity purposes.  *See Grupo Dataflux v. Atlas Global Grp.*, 541 U.S. 567, 570 (2004).  At the Court's request, on August 7, 2013, Fanno confirmed that she was a citizen of Ohio and the sole member of Branhaven when the complaint was filed.  ECF No. 91-1.

[29] Although the defendants named Scidera a third-party defendant, *see* ECF No. 31 at 18-19, the claim against Scidera is actually a counterclaim.  Fed. R. Civ. P. 14(a)(1) permits a third-party complaint against only a nonparty "who is or may be liable to it for all or part of the claim against it."  "A third-party claim may be asserted under Rule 14(a) only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to defendant."  *FDIC v. Bathgate*, 27 F.3d 850, 873 (3d Cir. 1994) (*quoting* C.A. Wright, A. Miller, M.K. Kane, Federal Practice and Procedure, Vol. 6, § 1446, at 355-58 (1990)).  Because Scidera's asserted liability is not derivative of the defendants' liability to Branhaven, the claim against Scidera is a counterclaim, not a third-party claim.  *See id.*; *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 454 n.1 (D.N.J. 1998); *Various Markets, Inc. v. Chase Manhattan Bank, N.A.*, 908 F. Supp. 459, 470-71 (E.D. Mich. 1995).

21

citizens of Delaware, diversity jurisdiction cannot sustain the counterclaim.  Supplemental jurisdiction is required.  *See* 28 U.S.C. § 1367.

Fed. R. Civ. P. 13(a) requires defendants to plead any counterclaims against the plaintiff that "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim."[30]  Fed. R. Civ. P. 13(a)(1); *See Vaughan v. Recall Total Info. Mgmt, Inc.*, 217 F. App'x 211, 223 (4th Cir. 2007).  Rule 13(h) permits joinder of additional parties to the counterclaim.  Section 1367(a) grants this Court "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." "Compulsory counterclaims under Fed. R. Civ. P. 13(a) always satisfy § 1367(a)'s 'same case or controversy' standard because they must satisfy the more stringent requirement that the counterclaim arise out of the same 'transaction or occurrence'

---

[30] Four factors are relevant to determining whether a counterclaim is compulsory: "1) Are the issues of fact and law raised in the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute the claim as well as the counterclaim? and (4) Is there any logical relationship between the claim and counterclaim?"  *Painter v. Harvey*, 863 F.2d 329, 331 (4th Cir. 1988).

as the jurisdiction-invoking claim."[31] Accordingly, supplemental jurisdiction allows the joinder of non-diverse counter-defendants.[32] *See Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 836-37 (3d Cir. 2011); 6 Wright & Miller, *Federal Practice & Procedure*, § 1414.

The defendants' counterclaim is the mirror image of Branhaven's claim: both parties seek declarations of their rights under the Licensing and Distribution Agreements and equitable relief enforcing that determination. *See* ECF Nos. 15, 31. Given the identical issues of facts and law and the logical relationship between the claims, the counterclaim is compulsory, and the Court has supplemental jurisdiction over the counterclaim against Scidera. *See Vaughn*, 217 F. App'x at 223; *Barefoot Architect*, 632 F.3d at 836-37; *Painter*, 863 F.2d at 331. 28 U.S.C. § 1367(a); Fed. R. Civ. P. 13(a). This Court has jurisdiction over all the claims remaining in this case.[33]

---

[31] *Smith v. James C. Hormell Sch. of Va. Inst. of Autism*, 3:08-CV-00030, 2010 WL 1257656, at *19 (W.D. Va. Mar. 26, 2010) (*citing* 13D Wright & Miller, *Federal Practice and Procedure* § 3567.1).

[32] In contrast, § 1367(b) does *not* grant supplemental jurisdiction over parties joined under Rules 14, 19, 20, or 24. *See United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 492-93 (4th Cir. 1998) ("[T]he limitation of § 1367(b) applies only to plaintiffs' efforts to join nondiverse parties.").

[33] The Court notes that, although not addressed by parties in the summary judgment briefing, the original and amended complaints also alleged federal question jurisdiction for unfair

B. Motion for Leave to File a Surreply

The defendants request leave to file a surreply, asserting that post-briefing facts --namely Branhaven's sale of Scidera Genomics to Neogen-- have arisen which affect Branhaven's ability to perform under the Licensing Agreement. ECF Nos. 82, 82-2. Branhaven opposes the motion, claiming that the surreply raises a new argument rather than responds to a new argument in the reply. ECF No. 85 at 1. It also requests leave to file a sur-surreply if the motion is granted. *Id.* at 2.

Unless otherwise ordered by the Court, a party may not file a surreply. Local Rule 105.2(a) (D. Md. 2012). Leave to file a surreply may be granted when the movant otherwise would be unable to contest matters presented in the opposing party's reply. *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd* 85 F. App'x 960 (4th Cir. 2004).

As discussed *infra*, the Court cannot determine whether the Licensing Agreement is enforceable on summary judgment. Accordingly, Branhaven's sale of Scidera is not relevant to any

competition and false designation of origin claims under the Lanham Act, 15 U.S.C. § 1125(a), which were subsequently dismissed. *See* ECF Nos. 1 ¶¶ 5, 33; 15 ¶¶ 5, 52; 64. If diversity were not present, supplemental jurisdiction would have been necessary for the remaining claims and could have been declined after the dismissal of the federal claim. *See* 28 U.S.C. § 1367(c)(3). Because the Court has original diversity jurisdiction--with supplemental jurisdiction over the counterclaim against Scidera--all claims are properly before the Court regardless of federal question jurisdiction.

issue that the Court can currently resolve.  The motion to file
a surreply will be denied.

    C.    Cross-motions for Summary Judgment

        1.    Legal Standard

The Court "shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).[34]  In considering the motion, the judge's function
is "not . . . to weigh the evidence and determine the truth of
the matter but to determine whether there is a genuine issue for
trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249
(1986).  A dispute about a material fact is genuine "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  *Id.* at 248.

The Court must "view the evidence in the light most
favorable to . . . the nonmovant and draw all reasonable
inferences in [its] favor," *Dennis v. Columbia Colleton Med.
Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court
must abide by the "affirmative obligation of the trial judge to
prevent factually unsupported claims and defenses from
proceeding to trial," *Bouchat v. Balt. Ravens Football Club,*

---

[34] Rule 56(a), which "carries forward the summary-judgment stan-
dard expressed in former subdivision (c)," changed "genuine
'issue' [to] genuine 'dispute,'" and restored the word "'shall'
. . . to express the direction to grant summary judgment."  Fed.
R. Civ. P. 56 advisory committee's note.

*Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

When cross-motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be reviewed in the light most favorable to the nonmovant." *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

　　　　2.　Choice of Law

The parties agree that Delaware law applies to interpretation of the Agreements. *See* ECF Nos. 66-1 at 25, 70-1 at 30 n.15. When a claim is based on state law, the choice of law rules are those of the state in which the district court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). The Maryland Court of Appeals "has long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract." *Jackson v. Pasadena Receivables*, 921 A.2d 799, 803 (Md. 2007). Accordingly, the Court will honor the parties' choice of Delaware law for the contract claims.

　　　　3.　Branhaven's Motion

Branhaven asserts that (1) the Licensing Agreement is unenforceable, and (2) the defendants are not entitled to the Technology under the Distribution Agreement. ECF No. 66-1.

26

a.   The Licensing Agreement

Branhaven asserts that the Licensing Agreement is
unenforceable because it is merely an agreement to agree that is
ambiguous and missing essential terms.   ECF No. 66-1 at 25-36.
It also asserts that the defendants are not entitled to specific
performance.   *Id.* at 38.   The defendants dispute these
contentions and additionally assert that Branhaven's arguments
are barred by (1) waiver and (2) estoppel.

i.   Waiver

The defendants assert that Branhaven has waived any
argument that the Licensing Agreement is unenforceable by
performance.   ECF No. 70-1 at 42.   Branhaven asserts that its
attempted performance was not a waiver, but rather "evidence of
good faith and of an effort to resolve a dispute between the
parties as to the interpretation of the document."   ECF No. 74
at 27.

The defendants' sole authority for the waiver by
performance argument is *Piccadilly Square v. Intercontinental
Construction Co.*, 782 S.W.2d 178 (Tenn. Ct. App. 1989).
Although the Chancellor in that case had found that Piccadilly
Square's performance waived arguments of lack of consideration
and mutuality of remedy, the Tennessee Court of Appeals did not
adopt this reasoning.   *See id.* at 182-83.   Rather, the Court of
Appeals examined the mutuality and consideration arguments on

27

the merits, and alternatively found waiver in a settlement agreement. *See id.* at 183.

*Piccadilly Square* is not persuasive or analogous to this case. Rather than a lack of mutuality or consideration, Branhaven asserts that the Licensing Agreement is an unenforceable agreement to agree missing essential terms necessary to the contract meaning. *See* ECF No. 66-1 at 25. Further, the parties have not executed any settlement agreement to waive the defense. *Cf. Piccadilly Square*, 782 S.W.2d at 183. Finally--assuming that it is enforceable--the Licensing Agreement is open ended with a complex pricing structure, unlike the agreement in *Piccadilly Square* that obligated the construction of at most 35 lots at fixed prices. *Cf. id.* at 180-81. *Piccadilly Square* is not persuasive, and the defendants have not shown any other basis for waiver.

### ii.    Estoppel

The defendants next assert that Branhaven is estopped from asserting that the Licensing Agreement is unenforceable. ECF No. 70-1 at 45. Branhaven asserts that the defendants cannot show the required reliance. ECF No. 74 at 26.

"The doctrine of equitable estoppel may be invoked when a party, by his statements or conduct, intentionally or unintentionally causes another, in reliance on those statements

or conduct, to change position to his detriment."[35]  The parties claiming estoppel must show, by clear and convincing evidence, that "(i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance." *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005).

BeefTek asserts that it detrimentally relied on Branhaven's representations that the Licensing Agreement was enforceable. ECF No. 70-1 at 46.  It argues that if it had not relied on Branhaven's representation, it would not have withdrawn its objection and "could have sought the protection of Section 365(n) of the Bankruptcy Code to maintain its license of the Technology." ECF No. 70-1 at 46.

There are several problems with this argument.  First, the stipulation stated that the Agreements "shall remain in full force and effect," and the "Stipulation is not a novation."  ECF No. 70-18.  Given this language, it is clear that the Licensing Agreement was only "in full force and effect" to the extent it ever could be; the "not a novation" provision indicates that no substantive change in the contractual relationship, if any, was

---

[35] *Heron Bay Prop. Owners Ass'n, Inc. v. CooterSunrise, LLC*, C.A. No. 5617-ML, 2013 WL 3871432, at *8 (Del. Ch. June 27, 2013), *adopted* 2013 WL 3734745 (July 16, 2013).

intended.  Further, even if the defendants relied upon a
statement by Branhaven that the Licensing Agreement was
enforceable, such a statement was a legal conclusion not
supportive of equitable estoppel.  Equitable estoppel depends on
misrepresentation of *facts* that misled the party asserting
estoppel.[36]  Accordingly a statement that the Licensing Agreement
is enforceable is not a basis for estoppel.

Similarly, the defendants' asserted detrimental reliance of
not using 11 U.S.C. § 365(n)[37] is unavailing.  Branhaven contends
that the Licensing Agreement does not reflect any agreement and
contains several ambiguous and conflicting terms; accordingly,
it asserts, the Licensing Agreement is meaningless and
unenforceable.  *See* ECF No. 66-1.  If Branhaven is correct,

---

[36] *See Nevins*, 855 A.2d at 249 (requiring lacking "knowledge or
the means of obtaining knowledge of the truth of the facts in
question"; *see also State v. Theodoratus*, 957 P.2d 1241, 1249
("[When] the representations allegedly relied upon are matters
of law, rather than fact, equitable estoppel will not be
applied.") (Wash. 1998); 2 John Norton Pomeroy, *Equity
Jurisprudence* (4th ed. 1918) ("There must be conduct--acts,
language, or silence--amounting to a representation or a
concealment of *material facts*" (emphasis added)).

[37] *See* 11 U.S.C. § 365(n) ("[T]he license . . . may elect to
*retain* its rights . . . *under* such contract . . . as such rights
*existed* immediately before the case commenced . . . ."). If the
contract is unenforceable, the rights never existed, making a
retention under § 365(n) impossible.

there were no rights for BeefTek to obtain under § 365(n), rendering the license useless.[38]

BeefTek also contends that it "cannot operate efficiently and reliably without access to the Technology; Branhaven's contention is an attempt to deny BeefTek such access." *Id.* Belying this contention, BeefTek had already secured the release of the Technology from Iron Mountain with the agreement of MMI.[39] *See* ECF No. 66-12. Accordingly, it could not have detrimentally relied on Branhaven's representations about the Technology: it already had its protection, as contemplated by the Agreements, through the formerly escrowed Technology. BeefTek has not shown by clear and convincing evidence that Branhaven is estopped from

_____

[38] The Court notes that the defendants have not asserted any claims under promissory or equitable estoppel theories. *Cf.* ECF No. 31. Given § 365(n)'s focus on executory contracts, it is an unlikely basis for relief under those estoppel theories.

[39] As the defendants indicate, the escrow withdrawal was technically by PML, and therefore under the Distribution Agreement. *See* ECF Nos. 66-12, 77 at 12 n.5. However, the request was signed by Lamar as CEO of *BeefTek* for PML. *See* ECF No. 66-12. Further, the decision to seek withdrawal of the escrow was made "jointly collectively within BeefTek and PML, Mr. Hogan, Mr. Cohen and John Lamar and others who we discussed, all decided we have to have them." ECF No. 70-3 at 15 Tr. 118:15-17. As there is no evidence that PML was or is functionally separate from BeefTek, it appears, and the parties generally assume, that BeefTek itself has access to the Technology. *See generally* ECF Nos. 66-1, 70-1, 74, 77.

asserting that the Licensing Agreement is unenforceable.[40] *See Nevins*, 885 A.2d at 249.

iii. Unenforceability of the Licensing Agreement

Branhaven asserts that the Licensing Agreement is unenforceable because (1) the parties did not intend an enforceable agreement, (2) the Licensing Agreement lacks the essential price term, and (3) the Licensing Agreement contains conflicting terms on usage of a TSC. ECF No. 66-1 at 29-37. BeefTek contends that all the requirements for a binding agreement were present. ECF No. 70-1 at 30.

Interpretation of a contract is a question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "When interpreting [the terms of] a contract, the court's ultimate goal is to determine the parties' shared intent. Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent: the words found in the written

---

[40] *Petroleum Traders Corp. v. Baltimore County*, Civ. No. L-06-0444, 2009 WL 2982942 (D. Md. Sept. 14, 2009), on which BeefTek relies, *see* ECF No. 70-1 at 47, is not to the contrary. In *Petroleum Traders*, Baltimore County was held to certain contracts despite its assertion that it had not complied with two legal formalities. *Petroleum Traders*, 2009 WL 2982942, at *3-4. Branhaven does not assert that the technical formalities of the contract were not met; rather its arguments are about whether the parties intended to have an enforceable contract and whether the Licensing Agreement has any meaning at all. Accordingly, *Petroleum Traders* is not persuasive.

instrument." *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) (footnotes omitted).

Under Delaware law, courts determining whether the parties intended to be bound by a contract make an objective inquiry: "whether a reasonable [person] would, based upon the 'objective manifestation of assent' and all of the surrounding circumstances, conclude that the parties intended to be bound by contract."[41] *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986).

Branhaven asserts that BTS executed the Licensing Agreement "when it was still actively searching for funding to enable it to do business. Had it not found funding, it would not have wished to be bound . . . ." ECF No. 66-1 at 28. It bases this assertion on an August 25, 2009 email exchange between Quattlebaum and Lamar discussing the drafting of the Licensing Agreement. *See* ECF No. 66-1 27-28. In the email, Quattlebaum expressed his concern that if BeefTek was not financed, MMI would be "locked out for [the] 2 years" of exclusivity. ECF No. 66-19 at 3. Lamar responded that BTS would only be going forward if it was financed, which required a signed agreement. *See id.* at 2. Lamar indicated that "if for any reason after the first year we do not go forward we will cancel and the

---

[41] *See also Leeds*, 521 A.2d at 1101 ("[T]he law is clear in Delaware . . . that subjective intention is itself not the test of whether a contract has been formed.")

exclusivity issue is moot. If we do go forward, we have minimum testing purchase requirements that assure MMI of ongoing volume. If we don't meet those requirements or pay for them then the agreement is over. I don't see where MMI is 'locked out.'" *Id.*

BeefTek suggests that by "cancel" Lamar meant that the parties would "negotiate a way to cancel the agreement."[42] ECF No. 70-1 at 41. Branhaven counters that "Lamar is an experienced, sophisticated businessman. It is unlikely he would have failed to make that distinction in an email he must have known would have some documentary value." ECF No. 74 at 25. Viewed in the light most favorable to the defendants, the email reasonably suggests a negotiated cancellation, implying an intention to be bound. *See Mellen*, 327 F.3d at 363. Similarly, Lamar's explanation of the termination of the exclusivity if BTS failed to meet the minimum testing requirements also shows an intention to be bound.[43]

---

[42] Neither the draft agreement attached to the email nor the final Licensing Agreement contains any provisions for cancellation. *See* ECF Nos. 66-19 at 4-6, 70-4.

[43] Branhaven relies on a November 4, 2009 email from Cohen to an investor. *See* ECF No. 66-1 at 28. In the email, Cohen stated "For all its flaws, [the Licensing Agreement] is serving us well--[MMI] has ramped up its efforts in support of our agenda wonderfully. DLA Piper is drafting both (a) a more-detailed contract, and (b) a [T]echnology escrow agreement." ECF No. 66-20. Although Cohen apparently had some concerns about the Licensing Agreement, standing alone and viewed in the light most favorable to the defendants, nothing in this email indicates a lack of intention to be bound.

Branhaven also asserts that the Licensing Agreement itself indicates a lack of intention to be bound, namely that "MMI and BT[S] will agree upon a satisfactory method to provide security to BT[S] for future Testing utilizing the Technology" and "the formal contract that will further detail the agreement between the parties set forth herein will include customary terms and conditions concerning indemnification among the parties." ECF No. 66-1 at 26-27; *see* ECF No. 70-4 at 4-5.

Despite its language, the Licensing Agreement indicates the intention to agree on these issues. The Licensing Agreement contains nearly an entire page on the complex procedure for BeefTek's utilization of a TSC if MMI were unable to process the results.[44] *See* ECF No. 70-4 at 4. Similarly, the Licensing Agreement contains a relatively comprehensive indemnification provision, even though the parties contemplated augmenting it in the formal agreement. *See id.* at 5. Further supporting the conclusion that these terms represented an actual agreement of the parties, the draft Letter of Agreement attached to the August 25, 2009 email did not contain an indemnification provision and only mentioned that the parties would agree on security for BTS. *See* ECF No. 66-9 at 5-6.

---

[44] This does not, however, resolve the question of what the TSC provisions mean or whether those provisions are enforceable. *See infra.*

Finally, Branhaven asserts that the First Amendment to the Licensing Agreement's change of the effective date indicates a lack of intention to be bound by the original. ECF No. 66-1 at 28-29. This does not show a lack of intention to be bound; rather, the reasonable inference is that the effective date was postponed to compensate for MMI's financial difficulties and subsequent bankruptcy. Accordingly, Branhaven has not shown that the Licensing Agreement is unenforceable because the parties did not intend to be bound.

Branhaven next asserts that the contract is missing the essential price term. ECF No. 66-1 at 29. BeefTek asserts that the price term is included. ECF No. 70-1 at 34. The parties agree that price is an essential term that must be included for the Licensing Agreement to be valid. *See* ECF Nos. 66-1 at 25, 29; 70-1 at 34-35; *see Leeds*, 521 A.2d at 1101 (stressing necessity of essential terms for an enforceable contract).

The Licensing Agreement states that MMI agreed to "provide testing services . . . at rates to be agreed upon and which will be in accordance with the prices set forth on Schedule A." ECF No. 70-4 at 2. Schedule A states: "The initial testing price is based on MMI's current Test volumes. Each quarter MMI will determine the actual testing cost." *Id.* at 7. The initial prices were: $5.75 for a one panel test, $7.16 for two panels, and $1.41 for each additional panel. *Id.* If MMI's costs

changed by more than 10%, it could revise the price on 30 days' notice. Schedule A also set a maximum of $7.00 for a single panel.

Branhaven asserts the License Agreement lacks a price term because of the flexibility for MMI to change the price. *See* ECF No. 66-1 at 29-30. Although MMI retained some flexibility in setting the price, Schedule A gave the starting price and a procedure restricting its adjustment. The essential price term was present.[45]

Finally, Branhaven asserts that the Licensing Agreement and the First Amendment conflict with Schedule A on when BTS could utilize a TSC and appears to contend that the TSC provisions are essential terms; accordingly, it argues that this makes the entire Licensing Agreement unenforceable. ECF No. 66-1 at 31-37. Branhaven has not provided any evidence or argument for the proposition that the TSC provisions are essential to the Licensing Agreement. *Cf.* 5-24 *Corbin on Contracts* §§ 24.23-24 (discussing how courts resolve conflicting provisions). Despite Branhaven's assertion, this argument addresses the proper

---

[45] *See Seidensticker v. Gasparilla Inn, Inc.*, Civ. No. 2555-CC, 2007 WL 1930428, at *5-6 (Del. Ch. June 19, 2007); 1-4 *Corbin on Contracts* § 4.4 ("[T]he fact that one of the parties reserves the power of fixing or varying the price or other performance is not fatal if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable or in good faith.").

construction of the TSC provisions, not the enforceability of the Licensing Agreement as a whole. Branhaven has not shown the Licensing Agreement to be unenforceable,[46] and accordingly is not entitled to summary judgment on that basis.[47]

### iv. Specific Performance

Related to its unenforceability argument, Branhaven asserts that BeefTek cannot sustain its specific performance claim because it cannot prove the terms of the Licensing Agreement-- specifically the TSC provisions--by clear and convincing evidence. ECF No. 66-1 at 38. BeefTek asserts that the Licensing Agreement and Schedule A provide two methods for using a TSC: (1) Branhaven's breach (for which it would receive no predictability incentive) and (2) BeefTek's obtaining better terms for testing from a TSC (for which Branhaven would receive the predictability incentive). ECF No. 70-1 at 37-40 & n.21.

"Under Delaware law, a party seeking the equitable remedy of specific performance must prove the existence and terms of an

---

[46] Branhaven also presents a short argument that BeefTek's failure to pay the Predictability Incentive or meet the minimum volume is an admission that the Licensing Agreement is unenforceable. ECF No. 66-1 at 37. It has provided no authority for this proposition. *See id.* This argument goes to BeefTek's breach of the Licensing Agreement--and its ability to seek relief under it--not the enforceability of the Licensing Agreement.

[47] Branhaven has not argued that it is entitled to summary judgment had the Court found the Licensing Agreement enforceable. *Cf.* ECF Nos. 66, 66-1.

enforceable contract by clear and convincing evidence." *Minn. Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 794 (Del. Ch. 2006). Specific performance "is a matter of grace that rests in the sound discretion of the court," that may not be granted unless the party seeking release "demonstrates that there is no adequate remedy at law." *Id.* (internal quotation marks omitted).

To determine the meaning of disputed contract terms, such as the TSC provisions, the Court must look to the documents to discern the operation of the provisions. "When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation." *Sassano*, 948 A.2d at 462. "[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the [extrinsic] evidence offered in order to arrive at a proper interpretation of contractual terms." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

The Licensing Agreement specifies that if "MMI is unable to provide Test results within the required reporting period, BT[S] shall have the right to use a TSC" on the condition that BTS provide MMI notification of its failure, and MMI had not cured within two weeks of the notice. ECF No. 70-4 at 4. The First Amendment slightly changed this provision, requiring BTS not to

be delinquent on any payments, and providing MMI no cure period in the first six months if it had been late twice in providing marbling testing. *See* ECF No. 70-10 at 3.

Schedule A is markedly different and grants BTS "the option of arranging for alternative TSC(s) of its choice to conduct such Testing and MMI shall be provided a two week option of meeting the alternative terms and conditions." ECF No. 70-4 at 7.

Although these provisions appear contradictory, it is not beyond reason that the parties intended that BeefTek could use a TSC if either (1) MMI was not timely delivering results or was otherwise in breach or (2) it could obtain better terms from another provider. However, the Predictability Incentive terms render the provisions ambiguous.

In the section granting BeefTek security through the use of a TSC in the event of MMI's breach, the Licensing Agreement expressly states that if BTS has the right to utilize a TSC, MMI will still be paid the Predictability Incentive. *See* ECF No. 70-4 at 4. Schedule A, on the other hand, states that Predictability Incentive "payments shall not be due to MMI at any time that MMI is in breach of the Agreement or is not meeting the standards and requirements necessary to remain the exclusive testing provider hereunder." *Id.* at 8.

Given the structure of the security section in the Licensing Agreement, it appears that the Predictability Incentive would apply even in the event of MMI's breach. The Schedule A provision that MMI is not entitled to the Predictability Incentive if it is in breach seems directly contrary to this. Similarly, it would make little sense for the Licensing Agreement provision on the Predictability Incentive to apply only to BeefTek's ability to use a better-terms TSC, which is not described until Schedule A and is not contemplated by the Licensing Agreement.[48] Accordingly, the TSC and Predictability Incentive terms are ambiguous, and the Court must consult extrinsic evidence. *See Eagle Indus.*, 702 A.2d at 1232.

Viewed in the light most favorable to the defendants, there is some evidence supporting its interpretation of two TSC provisions: (1) MMI's breach with no Predictability Incentive and (2) a better-terms TSC with a Predictability Incentive. For example, Quattlebaum explained that:

> [T]he real commercial value for the [T]echnology was not going to be from the price of the test for the margin that

---

[48] The escrow provisions appear to allow release no matter how BeefTek obtained the right to use a TSC. One provision allows release "in the event of default by MMI . . . or MMI's failure to meet the standards and requirements necessary to remain the exclusive Testing provider hereunder *or as otherwise provided herein*." ECF No. 70-4 (emphasis added). The Licensing Agreement also states that when "BT[S] has the right to utilize a TSC to conduct Testing, it will have access to the escrowed Technology," which appears to encompass any TSC situation. *See id.*

> we would make in doing the testing. We believe that the,
> in Schedule A there's a description of formulas which would
> be used to identify the compensation which would be based
> on the commercial value the [T]echnology generated. And
> so, therefore, it would be to our advantage to ensure that
> BeefTek would always have the lowest possible price for
> the--for testing.

ECF No. 70-5 at 9, Tr. 36:15-25; *see also* ECF No. 70-3 at 10-,
Tr. 76:14-22 (Lamar stating Quattlebaum's understanding). This
supports the defendants' view of the two triggers for a TSC: MMI
always intended to offer BTS the lowest price for the testing to
ensure the commercial value of the Technology. Allowing BTS to
use a TSC if it could obtain better terms than from MMI confirms
this intention as MMI would still get the Predictability
Incentive. Lamar clearly believed that BeefTek could have a TSC
if it negotiated a better deal. *See* ECF No. 70-3 at 9, Tr.
70:15-71:5.

However, there is also evidence that the parties only
intended use of a TSC and release of the Technology if MMI
breached. On June 11, 2010, Quattlebaum wrote to Lamar that
"[t]he only condition that permits [TSCs] to have access to our
database is our failure to do testing on a timely basis." ECF
No. 74-5. Lamar also testified that BeefTek's intention was for
MMI "to survive and succeed, we didn't want to run [MMI], we
didn't want to run a testing lab. . . . the last thing we wanted
was for them to go away." ECF No. 74-6 at 3, Tr. 79:11, 17.
The "arrangement that protected us in any event under any

circumstance in the event that [MMI] was not there or incapable of performing or failed to perform or for any reason was going to go away that we had the ability to survive." *Id.*, Tr. 80:9-14. Further, "[w]e wanted a workable deal that was going to protect everybody." *Id.*, Tr. 81:14-15.

This testimony indicates that the parties' intention was not to enable BeefTek to have a provider other than MMI if it could simply negotiate better terms for testing. Additionally, there is evidence that Lamar, for BeefTek, drafted the Schedule A TSC release; as the construction of the provisions cannot be otherwise resolved, this favors construing the terms against BeefTek.[49] *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985).

---

[49] The Delaware Supreme Court has held that this principle should ordinarily not be applied "whe[n] the terms of an agreement resulted from a series of negotiations between experienced drafters." *E.I. du Pont*, 498 A.2d at 1114. It is not clear to what extent the TSC provisions were the result of such negotiations; it appears that Lamar drafted the better-terms TSC provision on his own. *See* ECF No. 70-3 at 9, Tr. 70:15-16. Although the sophistication of the BeefTek representatives is not clear, they clearly did not believe Quattlebaum to be a competent businessman. *See, e.g.*, ECF No. 74-1 (Hogan stating that Quattlebaum "tried to be everything to everyone and failed miserably"); ECF No. 74-2 at 3, Tr. 119:11-13 (Hogan's belief that Quattlebaum "really didn't know shit from Apple Butter"). From this record, it appears that construing the provisions against BeefTek is appropriate. *Cf. E.I. du Pont*, 498 A.2d at 1114 (refusing application of principle when contract was between du Pont and Shell Oil after extensive negotiations).

Accordingly, there is a genuine dispute of material fact about the terms of the TSC. Branhaven is not entitled to summary judgment on BeefTek's specific performance claim.

b.   Distribution Agreement

Branhaven also asserts that the Distribution Agreement does not permit the defendants to access and retain the Technology. ECF No. 66-1 at 38-40. The defendants assert that the conditions for release of the escrowed Technology were met. *See* ECF No. 77 at 15.

Under the Distribution Agreement, as amended, MMI agreed to provide PML the Testing Results within 10 days of receipt. ECF No. 70-9 at 3. Should MMI fail to do so, PML was entitled to use of a TSC and access to the escrowed Technology, provided that PML was not delinquent in undisputed payments. ECF Nos. 70-9 at 5, 70-11 at 3.

On November 9, 2010, Hogan emailed Quattlebaum indicating that testing for Schwertner had been sent a month before and Red Angus tests had been received by MMI on September 15, 2010; Hogan indicated that these tests were "WAY past due." ECF No. 70-14. On November 29, 2010, Lamar reiterated that those tests were still pending. ECF No. 70-15. Further he indicated that they "would like to take the cards that are run by [MMI] . . . for processing at another alternate site so that we can evaluate the results and qualify them as another testing facility." *Id.*

Although unclear, it appears that the Red Angus tests were through PML[50]; there is no indication whether the tests for Schwertner were for PML or BTS. *See* ECF No. 70-15. Viewing the facts in the light most favorable to the defendants, these emails constituted written notice for the right to a TSC and release of the escrowed Technology. The tests had not been returned within the 10 days, and at least the Red Angus tests were for PML under the Distribution Agreement. There is no evidence that PML was delinquent in its payments or otherwise prevented from seeking a TSC and the Technology.

Accordingly, Branhaven is not entitled to judgment as a matter of law on the Distribution Agreement. The motion for summary judgment will be denied.

C.   The Defendant's Motion

BeefTek asserts that the Licensing Agreement is an enforceable contract. ECF No. 70-1. Branhaven contends that it is an unenforceable agreement to agree. ECF No. 66-1.

First, BeefTek asserts that the Licensing Agreement contains all essential terms, particularly the price term. ECF No. 70-1 at 34. The Licensing Agreement states that MMI agreed to "provide testing services . . . at rates to be agreed upon and which will be in accordance with the prices set forth on

---

[50] "We have a customer for Prime Marker that must have them." ECF No. 70-15.

Schedule A." ECF No. 70-4 at 2. Schedule A states: "The initial testing price is based on MMI's current Test volumes. Each quarter MMI will determine the actual testing cost." *Id.* at 7. The initial prices were: $5.75 for a one panel test, $7.16 for two panels, and $1.41 for each additional panel. *Id.* at 7. If MMI's costs changed by more than 10%, it could revise the price on 30 days' notice. Schedule A also set a maximum of $7.00 for a single panel. *Id.* at 7. This shows a mechanism for determination of the price: the initial price is set in Schedule A, and MMI had only a restricted ability to increase the price when its costs went up, subject to a maximum price. Accordingly, the Licensing Agreement contains a price term. *See Seidensticker*, 2007 WL 1930428, at *5-6; 1-4 *Corbin on Contracts* § 4.4.

Second, BeefTek asserts that the evidence shows that the parties intended to be bound by the Licensing Agreement. There is evidence for this. For example, the parties performed: Branhaven performed tests for which BeefTek paid. See ECF No. 70-8 at 8, Tr. 89:10-20. This indicates an intention to be bound. See *Carlson v. Hallinan*, 925 A.2d 506, 525 (Del. Ch. 2006), *clarified on other matters*, 2006 WL 1510759.

However, Lamar's August 25, 2009 email, viewed in the light most favorable to Branhaven, supports the opposite conclusion. Lamar stated that "if for any reason after the first year we do

not go forward we will cancel and the exclusivity issue is moot. If we do go forward, we have minimum testing purchase requirements that assure MMI of ongoing volume. If we don't meet those requirements or pay for them then the agreement is over. I don't see where MMI is 'locked out.'" ECF No. 66-19 at 2. The Licensing Agreement does not indicate any ability to cancel, and it is unclear in the letter to what Lamar was referring. *Cf.* ECF No. 70-4. Further, the parties' unfulfilled intention to sign a more detailed contract indicates that the "cancellation" could be an intentional decision not to execute the final binding agreement. *See* ECF Nos. 66-20, 70-4 at 4-5.

Viewed in the light most favorable to the defendants, the reasonable inference is that the Licensing Agreement was not intended to be a binding agreement but rather a preparatory step; a final binding agreement was to be executed when the funding and related issues were resolved. Accordingly, a genuine dispute of material fact exists about the parties' intentions. The Court cannot determine enforceability of the Licensing Agreement as a matter of law. *See* Fed. R. Civ. P. 56(a).

Because there is a genuine dispute of material fact about the enforceability of the Licensing Agreement, the Court cannot determine whether either party has breached the Licensing

Agreement or if BeefTek is entitled to the Technology under it.[51]
Its motion for summary judgment will be denied.

III.  Conclusion

For the reasons stated above, the motions for summary
judgment and for leave to file a surreply will be denied.

_8/14/13_
Date

William D. Quarles, Jr.
United States District Judge

---

[51] BeefTek has not presented any argument for its claim that it
is entitled to the Technology under the Distribution Agreement;
accordingly, it is not entitled to summary judgment on that
claim.  *See* ECF No. 70-1 at 47-52.